**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| MELVIN M. HUDSPATH, | Case No. 3:20-cv-00638-LRH-CLB |
| Petitioner, | |
| v. | **ORDER** |
| TIM GARRETT,[1] *et al.*, | |
| Respondents. | |

## I.    Summary

This matter is before the Court on (1) Petitioner Melvin M. Hudspath's petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 23); (2) Hudspath's motion for evidentiary hearing for Grounds 1 and 2 (ECF No. 60); and (3) the respondents' motion to seal exhibits (ECF No. 50).[2]

In 2015, Hudspath was sentenced in Nevada state district court to 70 years to life imprisonment for a jury verdict convicting him of five counts of sexual assault of a minor under 14 years of age; two counts of lewdness with a child under 14 years of age; four counts of use of a minor under 14 years of age in producing pornography; and four counts of possession of a visual presentation of the sexual conduct of a child.[3] (ECF No. 17-1.)

In his petition, Hudspath claims trial counsel rendered ineffective assistance by failing to move to suppress child pornography videos police obtained from Hudspath's cellphone; failing to

---

[1]According to the state corrections department's inmate locator page, Hudspath is incarcerated at Lovelock Correctional Center. The department's website reflects Tim Garrett is the warden for that facility. *See* Lovelock Correctional Center Facility | Nevada Department of Corrections (nv.gov). The Court will therefore direct the Clerk to substitute Tim Garrett for Respondent Kyle Olson, under, *inter alia,* Fed. R. Civ. P. 25(d).

[2]The parties briefed the motion for evidentiary hearing. (ECF Nos. 61–63.)

[3]The jury acquitted Hudspath of lewdness with a child in a courtyard (Count 7). (ECF No. 29-17 at 3.)

challenge the breadth of the search warrant for the contents of the cellphone; failing to object to repetitive publication of child-pornography videos and photographs to the jury; failing to object to the prosecutor's closing argument; admitting Hudspath's guilt in a stipulated jury instruction; eliciting unfavorable testimony; and failing to present mitigation evidence at sentencing. He also claims the prosecutor committed misconduct in closing remarks, and the trial court made an instructional error. (ECF No. 23.)[4]

The Court will grant the motion to seal certain exhibits (ECF No. 50). The Court will deny the motion for an evidentiary hearing (ECF No. 60). The Court will deny Grounds 1, 5, 9 and 10 of the petition; dismiss with prejudice Grounds 2, 3, 4, 6, 7, and 8 of the petition along with Hudspath's claims that the standard of review in 28 U.S.C. § 2254(d) is unconstitutional; and deny the petition (ECF No. 23). The Court will grant a certificate of appealability for Ground 1 of the petition and deny a certificate of appealability for all other grounds and claims in the petition.

## II.   Background[5]

At trial, Latonia Hardy testified she had a daughter, R.H.,[6] who was seven years old at the time, and two adult daughters, Latoya, and Kimberly Williams. Hardy explained that Williams had two children with Hudspath, and after Williams and Hudspath broke up, Hudspath visited their children at Hardy's house in Las Vegas, Nevada on four occasions in December 2013, and in January of 2014. (ECF Nos. 50-6 at 2; 50-8 at 130–33; 50-9 at 76–96.)

In March of 2014, Hudspath took his two children to see their godparents, Daneah Belton, and her fiancé Daimon James, who lived in Victorville, California. Belton's mother was married

---

[4]This Court deferred ruling whether Hudspath can overcome the procedural default of Grounds 2, 3, 4, 6, 7 and 8 under *Martinez v. Ryan*, 566 U.S. 1 (2012). (ECF No. 39.)

[5]The Court summarizes the relevant state court record for consideration of the issues. The Court makes no credibility findings or factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. The Court's failure to mention specific evidence or a category of evidence does not signify the Court overlooked that evidence.

[6]The Local Rules of Practice state: "[p]arties must refrain from including—or must partially redact, where inclusion is necessary—[certain] personal-data identifiers from all documents filed with the court, including exhibits, whether filed electronically or in paper, unless the court orders otherwise." LR IA 6-1(a). This includes the names of minor children, and only a child's initials should be used. *Id.* The witness referred to herein as "R.H." was a minor at the time of the offenses and when she testified at trial.

to Hardy's brother and Belton was best friends with Hardy's daughter, Latoya. During his visit with Belton and James, Hudspath left behind his cellphone when he went to the store. Belton and James looked at photographs of their godchildren on the cellphone but also saw videos of Hudspath and Hardy's daughter, R.H., in what James described as, "graphic picturing of a child giving oral." James said the first video depicted a "living room" with Hudspath on the couch and a lamp in the background. The second video, taken outside, depicted Hudspath's vehicle. Belton and James recognized Hudspath's voice saying R.H.'s nickname on the video. Belton heard Hudspath tell R.H. she gave "better head then [sic] your sisters." The Las Vegas police and Victorville Sheriff were contacted, and Belton and James kept Hudspath at their house so the sheriff could arrest him. (ECF Nos. 50-8 at 57–69, 76–80, 84, 96–107, 119, 137–38; 50-9 at 93–94.)

San Bernardino County Sheriff deputy Antonio Juarez testified he went to Belton's residence for a welfare check on two children and because individuals located in Las Vegas and Victorville reported the existence of child pornography on a cellphone. Upon arrival, he saw Hudspath exit the driver's seat of a Toyota Camry and enter the residence. Juarez parked his patrol vehicle in the driveway behind Hudspath's vehicle and went to the front door. Belton met Juarez in the living room. Juarez asked if Belton called the sheriff, and Belton responded with a "concerned expression." When Hudspath entered the room, Juarez asked for his identification. Hudspath left the room and Belton "leaned" toward Juarez and "kind of whispered that's him." Hudspath was on formal probation in San Bernardino County, California and an active fugitive arrest warrant had issued. Juarez arrested Hudspath on the warrant, placed Hudspath in the patrol vehicle, and returned to the residence to continue investigating the child-pornography allegations. (ECF Nos. 50-8 at 18–28, 81, 119; 52-1 at 6.)

Belton then told Juarez "she was going through [Hudspath's] cellphone and had located some videos of [R.H.] performing sexual acts on an adult." She gave him the child's name, the relationship, and said the child resided in Las Vegas. Juarez asked Belton for the location of the cellphone. She said it was either in the house or in Hudspath's vehicle. Belton "looked in the house" while Juarez "went outside and looked in the car," which was the only one in the driveway. The car "window was down" and "the phone was sitting on the driver's seat of the car." Juarez

reached into the car and retrieved the cellphone. (ECF No. 50-8 at 26–27, 43–45.)

As Juarez returned to the residence, he heard Hudspath "screaming at the top of his lungs and yelling from [Juarez's] patrol vehicle." Belton and James saw Hudspath "yelling and hitting his head on the window" of the police vehicle. Belton identified the cellphone taken from Hudspath's vehicle as the cellphone containing the video. Juarez gave the cellphone to Belton who showed him one of the videos. Hudspath later admitted the cellphone belonged to him. Juarez kept the cellphone locked inside his police vehicle until he gave it to Detective Scott Stafford of the San Bernardino County Sheriff's Department. (*Id.* at 26–28, 33–36, 43–48, 55, 82.)

Detective Stafford testified he looked "at the contents of the phone" and saw videos depicting R.H. "oral copulating a man" and "sitting on the groin of the man who had an erect penis and butting her up and down on it." He "determined there was stuff on there that [the police] need to get off of" the phone, and "authored a search warrant" "to download all the contents off of it." He said they were searching "[t]o extract all the data, such as video images, pictures and any data on the phone that could be extracted for evidentiary purposes" to identify the victim. Stafford sent the cellphone to the "hi-tech" division to download "[e]verything on the phone" including "[p]hotos, videos, text messages, phone call data, call list," and said "[a]nything that is stored on this phone, which is a computer, that he can extract he will." Stafford identified State Exhibits 1–4 as the videos he saw on the cellphone. (ECF No. 50-9 at 7–26.)

San Bernardino County Sheriff's Department detective Daniel Helmick, of the hi-tech division, testified he was asked to look for "all evidence containing child pornography; videos, photos." He used software to extract such items and "scrolled through" the photos on the phone to "real quick just to kind of get a reference to what was on that." He identified four videos: one taken on December 29, 2013, and three taken on January 19, 2014. He identified the four videos as: (1) State's Exhibit 1, created on December 29, 2013, at 1:15:16 p.m; (2) State's Exhibit 2, created on January 19, 2014, at 3:32:15 a.m; (3) State's Exhibit 3, created on January 19, 2014, at 3:43 a.m; and (4) State's Exhibit 4, created on January 19, 2014, at 5:27 a.m. The videos were moved to a folder called "Bluetooth" on February 14, 2014. (*Id.* at 27–72.)

Belton testified State's Exhibit 1 was one of the videos she saw on Hudspath's cellphone

and in it, she recognized R.H. and Hudspath's voice using R.H.'s nickname. Belton recognized R.H. depicted in State's Exhibits 2 and 3 and Hudspath's belly button depicted in State's Exhibit 4. Williams testified Hudspath has an "outie" belly button and Williams, Belton, James, and Hardy each recognized Hudspath's belly button in photographs corresponding to the videos. Williams identified Hudspath's penis in photographs taken from the videos. Williams recognized Hudspath's voice, watch, and sneakers, on the videos, and her mother's living room in a photograph taken from State's Exhibit 4. Hardy recognized Hudspath's voice on one of the videos and identified her living room couch and lamp in photographs taken from State's Exhibit 4. James recognized Hudspath's voice on State's Exhibit 1 and Hudspath's vehicle in a photograph taken from State's Exhibit 4. Juarez heard Hudspath's voice during their interview and said the voice in the video sounds like Hudspath. Juarez had asked Hudspath to lift his shirt so Juarez could see his abdomen during their interview, and Juarez agreed the belly button depicted in a photograph taken from the video appeared to be Hudspath's belly button. (ECF Nos. 50-8 at 28–35, 42–43, 51, 69–74, 104–107, 133–40, 144–45; 50-9 at 91–93, 95–97.)

R.H. testified she was 7 years old and gave details about incidents in three locations: in a parking lot, in her mother's house, and in a courtyard. She said Hudspath told her not to tell her "momma" he "put [his] wee-wee in" her mouth while they were in a parking lot during a trip to the store. He told R.H. that if she told, her mother "gonna whoop" her or she would "get in trouble." R.H. identified herself and Hudspath's vehicle in a photograph taken from State's Exhibit 1. R.H. said Hudspath "started to feel on" her, he "humped" her in the parking lot, and "some white stuff came out" of his "wee-wee." R.H. said she told her mother, upon her return from the store, that Hudspath "was feeling on" her. She said another time they were in a courtyard, and "some white thing came out" of Hudspath. She testified Hudspath woke her when she and her brother were in a room, took off her pants, and touched her private part. She identified herself in a photograph taken from State's Exhibit 4. (ECF No. 50-9 at 120–39.)

Metro Detective Igor Dicaro testified he conducted a video-taped forensic interview with R.H. at the Children's Assessment Center, while her mother Hardy was in the waiting room. Dicaro asked R.H. whether she knew what she was there to talk about, and R.H. replied that it was about

Hudspath "who was humping her." Dicaro understood that as a reference to "some kind of sexual contact." Dicaro said R.H. disclosed instances during which Hudspath was humping her; put his thing in her mouth; and touched her cu-cu, which she identified on a drawing as the vaginal area of a girl. R.H. told Dicaro about three encounters with Hudspath: (1) in a parking lot next to a car; (2) in a courtyard next to a tree; and (3) in her residence. She told Dicaro that Hudspath took her in his car to the store and they were humping with clothes on in a parking lot during which he touched her vaginal area on top of her clothes, put his thing in her mouth, and made her spit it on the floor. R.H. told Dicaro that Hudspath told her not to tell her mother; otherwise she would get a "whoopin." R.H. told Dicaro that Hudspath touched her cu-cu under her skirt while under a tree in a courtyard. R.H. told Dicaro that Hudspath woke her in her house, removed her pants, "put his thing" in her mouth, and "white stuff came out of it." She told Dicaro that Hudspath stopped so her brothers would not see them. (*Id.* at 147–49, 152–63, 173.)

## III.   Governing Legal Standards

### A.   The Anti-Terrorism and Effective Death Penalty Act (AEDPA)

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the legal standards for consideration of Hudspath's petition:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established federal law, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result

different from [Supreme Court] precedent." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established federal law within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10, 412) (internal citation omitted).

"[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated that "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.") (internal quotation marks and citations omitted). A state court is not required to cite Supreme Court cases or even be aware of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 357 U.S. 3, 8 (2002). The petitioner carries the burden of proof. *See Pinholster*, 563 U.S. at 181 (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)). If the state court's decision meets either prong of § 2254(d)(1), a federal habeas court "must review the substantive constitutionality of the state custody de novo." *Frantz v. Hazey,* 533 F.3d 724, 737 (9th Cir. 2008) (en banc). Upon *de novo* review, a federal habeas court reviewing a state court ruling ordinarily applies a harmless error standard, examining whether the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 623 (1993).

If a prisoner "failed to develop the factual basis of a claim in State court proceedings,"

under AEDPA a federal court "shall not hold an evidentiary hearing on the claim" unless the prisoner satisfies 28 U.S.C. § 2254(e)(2). *Shinn v. Ramirez*, 142 S. Ct. 1718, 1734–37 (2022). The Ninth Circuit has held a petitioner is entitled to an evidentiary hearing in a federal habeas proceeding if he can (1) show he has not failed to develop the factual basis of the claim in the state courts; (2) meets one of the factors identified by the Supreme Court in *Townsend v. Sain*, 372 U.S. 293 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992);[7] and (3) makes colorable allegations that, if proved, would entitle him to habeas relief. *Insyxiengmay v. Morgan*, 403 F.3d 657, 669–71 (9th Cir. 2005).

### B.    Procedurally-Defaulted-IAC Claims

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the 'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). Where a state court would dismiss a claim for failure to first present the claim in state court in accordance with state procedures, the claim is "procedurally defaulted." *Shinn*, 142 S. Ct. at 1727–28. Federal habeas review of a procedurally defaulted claim "is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). An exception to the requirements of cause and prejudice permits a petitioner to overcome the procedural default of an ineffective assistance of counsel (IAC) claim against trial counsel under the following conditions:

> [W]here (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the

---

[7]A defendant is entitled to a federal evidentiary hearing on his factual allegations if:

(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole; (3) the fact-finding procedure employed by the state court was not adequate to afford a full and fair hearing; (4) there is a substantial allegation of newly discovered evidence; (5) the material facts were not adequately developed at the state-court hearing; or (6) for any reason it appears the state trier of fact did not afford the habeas applicant a full and fair fact hearing.

*Townsend*, 372 U.S. at 313.

"ineffective-assistance-of-trial-counsel claim"; and (4) state law *requires* that an "ineffective assistance of trial counsel [claim] . . . be raised in an initial-review collateral proceeding."

*Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (quoting *Martinez*, 566 U.S. at 13–16).[8]

An ineffective-assistance-of-trial-counsel claim "is insubstantial" if "it does not have any merit" or is "wholly without factual support." *Martinez*, 566 U.S. at 14–16 (citing *Miller-El v. Cockrell*, 537 U.S. 322 (2003)). The Supreme Court has cited the standard for issuing a certificate of appealability as an analogous standard. *Id.* According to that standard, a claim is substantial if "reasonable jurists could debate whether . . . the [issue] should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El*, 537 U.S. at 336. This does not require a showing the claim will succeed, only that its proper disposition could be debated among reasonable jurists. *Id.* at 337.

## C.      Effective-Assistance-of-Counsel

On a petitioner's claims of ineffective assistance of counsel, he must demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* It is a petitioner's burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment" and "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112; *Pinholster*, 563 U.S. at 189. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." *Burt v. Titlow*, 571 U.S. 12, 24 (2013).

---

[8]Nevada prisoners must raise IAC claims in an initial state petition for postconviction review, i.e., the initial collateral review proceeding. *See Rodney v. Filson,* 916 F.3d 1254, 1259–60 (9th Cir. 2019).

An IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland,* 466 U.S. at 690. When considering an IAC claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . ." *Id.* at 689. In considering such claims, a court is obligated to "determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." *Id.* at 690. On the performance prong, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. *Id.* at 689–90. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. A petitioner's claims of IAC are examined separately to determine whether counsel was deficient; however, "prejudice may result from the cumulative impact of multiple deficiencies." *Boyde v. Brown,* 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting *Cooper v. Fitzharris,* 586 F.2d 1325, 1333 (9th Cir. 1978)).

"Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *Richter,* 562 U.S. at 105 (internal citations omitted); *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

## IV.   Discussion[9]

---

[9]Hudspath contends the standard of review in 28 U.S.C. § 2254(d) is unconstitutional under the Suspension Clause, "fundamental principles of separation of powers," the Eighth Amendment prohibition against cruel and unusual punishment, and the Fifth and Fourteenth Amendment guarantees of due process. (ECF No. 23 at 10.) Respondents contend this Court should reject these arguments. (ECF No. 56 at 14.) Hudspath cites no facts supporting these claims. He furthermore concedes the Ninth Circuit Court of Appeals has rejected arguments that AEDPA violates the Suspension Clause and separation of powers doctrine. (ECF No. 23 at 10) (citing *Crater v. Galaza*, 491 F.3d 1119 (9th Cir. 2007)). Rule 2(c) of the Rules Governing Section 2254 Cases requires a federal habeas petition specify all grounds for relief and "the facts supporting each ground." Conclusory allegations unsupported by specific facts may

**A.    Ground 1—Failure to Move to Suppress the Contents of the Cellphone**

Hudspath alleges trial counsel provided ineffective assistance in violation of the Fifth, Sixth, and Fourteenth Amendments, by failing to move to suppress the child-pornography videos and photographs seized from Hudspath's cellphone. He claims the search of his cellphone was unlawful under *Riley v. California,*[10] which, after the search in Hudspath's case and before his judgment was final, held law enforcement must obtain a warrant before searching the contents of a cellphone seized from a person incident to an arrest. 573 U.S. 373 (2014). Respondents contend a motion to suppress was futile because, as the Supreme Court of Nevada concluded, *Riley* was decided after the search of Hudspath's cellphone and law enforcement relied in good faith on existing California precedent in *People v. Diaz*[11] for permission to search the cellphone seized incident to arrest. Respondents oppose Hudspath's motion for an evidentiary hearing to develop the record to support this claim. (ECF Nos. 23 at 10–13; 56 at 18–22; 59 at 20–38; 60 at 5–6; 61 at 2; 63.) The Court, applying *de novo* review, will deny Ground 1 and deny an evidentiary hearing but grant a certificate of appealability.

**1.    Applicable Principles**

In addition to the two requirements of *Strickland*, "[w]here defense counsel's failure to litigate a Fourth Amendment claim competently is the principal allegation of ineffectiveness, the defendant must also prove his Fourth Amendment claim is meritorious and there is a reasonable probability the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). To prevail on a Fourth Amendment claim, "the complainant need prove only that the search or seizure was illegal and that it violated his reasonable expectation of privacy in the item or place at issue." *Id.* at 374. However, "[e]xclusion of evidence does not automatically follow from the fact that a Fourth

---

be summarily dismissed. *Mayle v. Felix*, 545 U.S. 644, 649, 655–56 (2005); *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). As Hudspath fails to specify any facts supporting each of these alleged grounds for relief, the Court hereby dismisses them with prejudice as conclusory.

[10]573 U.S. 373 (2014).

[11] 51 Cal.4th 84, 244 P.3d 501, 119 Cal.Rptr.3d 105 (2011), *abrogated by Riley*, 573 U.S. 373.

Amendment violation occurred." *Davis*, 564 U.S. at 244. When police conduct a search in objectively reasonable reliance on binding appellate precedent that is subsequently overturned, the exclusionary rule does not apply to the search because excluding evidence in such cases deters no police misconduct and imposes substantial social costs. *Id.* at 239–241.

a.      **Searches of Persons Incident to Arrest**

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). One exception to the warrant requirement governs searches of the contents of items found on a person incident to a lawful arrest. *See United States v. Robinson*, 414 U.S. 218, 220–36 (1973). In *Robinson*, the Supreme Court held that, following the arrest of a defendant for driving with a revoked operator's permit, an officer's warrantless pat down search of the defendant that yielded a cigarette package, and the officer's search of that package, which revealed heroin capsules, constituted a valid search-incident-to arrest. *Id.*

The Supreme Court of California held in *Diaz* that commensurate with *Robinson*, police could search the contents of a cellphone seized from a person incident to arrest. *Diaz,* 51 Cal. 4th at 88, 119 Cal. Rptr. 3d at 106, 111, *abrogated by Riley*, 573 U.S. 373. Police in *Diaz* listened to a drug transaction that took place in defendant's vehicle, stopped the vehicle, and took the defendant to the police station for booking where they seized his cellphone from his person. *Id.* at 88–89, 119 Cal. Rptr. 3d 106–07. Without a warrant, police discovered text messages on the cellphone that constituted evidence of the crime for which defendant was arrested. *Id.* The Supreme Court of California likened the search to the search-incident-to-arrest in *Robinson* and explained that "because the cellphone was immediately associated with defendant's person, [the officer] was entitled to inspect its contents without a warrant at the sheriff's station, 90 minutes after defendant's arrest, whether or not an exigency existed." *Id.* at 93; 119 Cal. Rptr. 3d at 110–11. (internal citations and quotation marks omitted). The Supreme Court of California noted the United States Supreme Court's decision in *Gant*, which authorizes warrantless searches of vehicles incident to an arrest under certain conditions, was irrelevant to the decision in *Diaz* as the cellphone

in *Diaz* was taken from the defendant's person. *Diaz*, 51 Cal. 4th at 95–96 n.9, 119 Cal. Rptr. 3d at 112–13 n.9. The Supreme Court abrogated *Diaz* in *Riley*, by declining "to extend *Robinson* to searches of data on cell phones" and holding officers "must generally secure a warrant before conducting such a search." *Riley*, 573 U.S. at 386.

### b.    Searches of Vehicles Incident to Arrest

In *Gant*, the United States Supreme Court established the exception to the warrant requirement for searches of vehicles incident to arrest, that permits, *inter alia*, the warrantless search of "the passenger compartment of an arrestee's vehicle and any containers therein" provided the officer "has reason to believe the vehicle contains evidence of the offense of arrest." 556 U.S. at 343–44; *see also Riley*, 573 U.S. at 385 (explaining the decision in *Gant* "added" this "independent exception" for warrantless searches of a vehicle incident to arrest that stems from "circumstances unique to the vehicle context" rather than concerns for officer safety and evidence preservation underlying the search incident to arrest exception espoused in, *inter alia, Robinson*).

In *Gant*, police investigated a residence for drug activity based on an anonymous tip, and learned there was an outstanding warrant for Gant's arrest for driving while on a suspended license. 556 U.S. at 335. Police saw Gant arrive at the residence, park at the end of his driveway, exit his vehicle, and shut the car door. *Id.* at 336. Police arrested Gant on the warrant, locked him in a patrol car, searched his vehicle and discovered a firearm and cocaine inside a jacket pocket. *Id.* The Supreme Court held the search invalid "[b]ecause police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein . . . ." *Id.* at 344.

### 2.    Additional Background

At trial, a juror asked, "why there wasn't a search warrant for the car." Before responding, and outside the jury's presence, the parties discussed the basis for the search of the cellphone:

> PROSECUTOR 1: We were able to find case law directly on point that in probable cause situations, which obviously we argue if there's going to be a probable situation if that phone contained evidence of a crime then they actually do not need a search warrant for automobiles in California. Nevada laws is [sic] with a different meaning [sic] exigent circumstances in order to alleviate the search warrant, but California does not require that. So, he's under no duty to get a search warrant. But obviously it's more a legal question than it is a factual question.

. . . .

THE COURT: [W]hat's your position, [defense counsel]?

DEFENSE COUNSEL: He obviously knows the law in California. I don't see any problem.

PROSECUTOR 1: [T]o get into a legal discuss[ion] with this witness I don't think is very appropriate.

DEFENSE COUNSEL: But doesn't he have a basis for why he did what he did. I mean, he'd be able to answer that.

PROSECUTOR 2: [I]'d be more comfortable [if] we were going to do that, to take him outside the presence just to see—the reason he arrested him, there are other reasons too and I don't what [sic]—

PROSECUTOR 1: So it could have been a[n] inventory search incident to arrest because it was an inventory search. He was going away no matter what happened once that phone—

PROSECUTOR 2: He had the –

PROSECUTOR 1: Yeah. Different situation because he had some warrants.

PROSECUTOR 2: So, it's messy.

DEFENSE COUNSEL: It is messy. As far as a recommendation about taking him outside the presence . . . that's not a bad idea.

PROSECUTOR 2: And we object to this question.

THE COURT: I mean, so you caused the subject to come up, and there was no motion to suppress this evidence.

DEFENSE COUNSEL: I think he can explain why he didn't get search warrants . . . I know the State's objecting but he clearly will have a reason and a[n] answer as to why he didn't have a search warrant.

THE COURT: Can you have a little side conversation with him over here for a moment? We'll keep the noise on. Just kind of take him on the side and ask him. Take him out in the back hallway . . . .

PROSECUTOR 2: So, he said exactly which [sic] we thought which was because he was being arrested on warrants others [sic] he was under arrest search incident to arrest including the car. He didn't need a warrant. So, we asked if it was correct to say under California law he didn't a [sic] warrant and he said yes.

DEFENSE COUNSEL: And those were the traffic—those are traffic laws.

PROSECUTOR 2: No.

DEFENSE COUNSEL: What was the warrant?

PROSECUTOR 2: Grand larceny auto.

14

DEFENSE COUNSEL: California.

PROSECUTOR 2: Uh-huh.

DEFENSE COUNSEL: Okay. We can just leave it.

PROSECUTOR 2: Well no we need to ask him so he can just say—

THE COURT: So, you're going to ask the question and he's going to answer that under California law he didn't need one. So, he knows just to say that and nothing else?

PROSECUTOR 2: Okay. Thank you.

DEFENSE COUNSEL: Perfect.

Juarez testified: "Under California law at that time I didn't need a search warrant." (ECF No. 50-8 at 52–54.)

At a hearing before sentencing, Hudspath claimed he asked trial counsel to file a motion to suppress evidence on the grounds the cellphone was unlawfully obtained and searched without a warrant, and said he even wrote a motion, but trial counsel refused it. Trial counsel stated Hudspath never presented to him a motion to suppress, but counsel looked into the issue, and tried to explain to Hudspath that the protocol followed by the police was appropriate. (ECF No. 65-1 at 3–9.)

### 3.    The Supreme Court of Nevada's Determinations

On direct appeal, the Supreme Court of Nevada ruled the admission of the cellphone's contents was not plain error because it appeared the deputy searched the cellphone contents in objectively reasonable reliance on *Diaz*, and, alternatively, the evidence was admissible because it would have been inevitably discovered during an inventory search of Hudspath's vehicle:

*Admission of cellphone evidence not plain error*

Hudspath focuses his appeal on the district court's alleged error in admitting evidence obtained from his cellphone without a warrant. Because Hudspath did not raise the issue below, we review for plain error. *See Green v. State,* 119 Nev. 542, 545, 80 P.3d 93, 95 (2003). To succeed, Hudspath must show that (1) an error existed, (2) the error was so obvious that it reveals itself by a casual inspection of the record, and (3) the error seriously affected his substantial rights by causing actual prejudice or a miscarriage of justice. *Id.; Patterson v. State,* 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995).

The district court did not commit plain error in admitting the cellphone evidence. Although it appears that *Riley v. California* would require Deputy Juarez to obtain a warrant before searching his cellphone, *Riley* was not decided until three months after Hudspath's arrest. 573 U.S. ___ , 134 S. Ct. 2473 (2014). The search

was conducted in California and, *pre-Riley,* the California Supreme Court condoned warrantless cellphone searches incident to arrest. *See People v. Diaz,* 244 P.3d 501 (Cal. 2011). Since Hudspath did not move to suppress the cellphone in district court, we do not have the benefit of testimony on Deputy Juarez's reliance on *Diaz* or other law in proceeding as he did. But, as the State argues, Deputy Juarez appears to have reasonably relied on *Diaz* in examining the cellphone. While the exclusionary rule generally prohibits the admission of evidence obtained in violation of the Fourth Amendment, the Supreme Court has held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis v. United States,* 564 U.S. 229, 232 (2011); *see United States v. Gary,* 790 F.3d 704, 708–09 (7th Cir. 2015) (declining to reverse and order suppression of cellphone evidence based on *Riley* where the search pre-dated *Riley* and was authorized by *pre-Riley* caselaw, reliance on which was objectively reasonable).

The additional arguments Hudspath offers for suppression of the cellphone evidence are not supported by relevant authority or are argued for the first time in his reply brief and so are not properly before the court. *See* NRAP 28(c); *Maresca v. State,* 103 Nev. 669, 673, 748 P.2d 3, 6 (1987) (stating the court will not consider arguments not cogently made and supported by relevant authority). Because plain error does not appear, we decline to reverse based on the district court's failure to sua sponte exclude the cellphone evidence.

> [FN1] 1Although neither party makes the argument, it appears that the inevitable discovery doctrine would apply. Thus, even if the search was unreasonable, the evidence is not subject to exclusion. *See Camacho v. State,* 119 Nev. 395, 402, 75 P.3d 370, 375 (2003).

(ECF No. 17-5 at 2–4 n1.)

In postconviction review proceedings, the Supreme Court of Nevada relied on its holding on direct appeal and held trial counsel's failure to move to suppress evidence seized from Hudspath's cellphone was not ineffective because a motion to suppress the evidence was meritless:

> [H]udspath argues that he received ineffective assistance of trial counsel. The district court denied the petition without an evidentiary hearing. We affirm.
>
> [FN1] Hudspath did not provide this court with trial transcripts or a copy of his postconviction petition for writ of habeas corpus. Thus, our review is limited to the appellate briefing on issues relating to the trial. We remind counsel that it is the appellant's burden to provide all materials essential to the decision of issues presented on appeal. *See* NRAP 30(b); *Thomas v. State,* 120 Nev. 37, 43 n.4, 83 P.3d 818, 822 n.4 (2004) ("Appellant has the ultimate responsibility to provide this court with portions of the record essential to determination of issues raised in appellant's appeal." (internal quotation marks omitted)).
>
> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient in that it fell below an objective standard of reasonableness and that prejudice resulted in that there was a reasonable probability of a different outcome absent counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432–

16

33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). The petitioner must demonstrate the underlying facts by a preponderance of the evidence. *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004), and both components of the inquiry must be shown. *Strickland*, 466 U.S. at 697. For purposes of the deficiency prong, counsel is strongly presumed to have provided adequate assistance and exercised reasonable professional judgment in all significant decisions. *Id.* at 690. The petitioner is entitled to an evidentiary hearing when the claims asserted are supported by specific factual allegations that are not belied by the record and that, if true, would entitle the petitioner to relief. *See Nika v. State*, 124 Nev. 1272, 1300–01, 198 P.3d 839, 858 (2008). We defer to the district court's factual findings that are supported by substantial evidence and not clearly wrong, but review its application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

. . . .

Hudspath . . . argues that counsel should have moved to suppress the cellphone that contained inculpatory video footage. We concluded on direct appeal that the cellphone evidence was properly admitted. *Hudspath v. State*, Docket No. 68655 (Order of Affirmance, May 26, 2017). Hudspath has not shown deficient performance or prejudice based on counsel's omission of a meritless challenge. *See Ennis v. State*, 122 Nev. 694, 706, 137 P.3d 1095, 1103 (2006) ("Trial counsel need not lodge futile objections to avoid ineffective assistance of counsel claims."). The district court therefore did not err in denying this claim without an evidentiary hearing.

(ECF No. 17-12 at 2–4.)

### 4.      Analysis of Ground 1

#### a.      Reliance on *Diaz* is unreasonable.

The Supreme Court of Nevada's determination that trial counsel was not ineffective in failing to move to suppress the contents of the cellphone because the motion lacked merit is predicated on a finding that Deputy Juarez relied on *Diaz*. That determination is based on an unreasonable determination of the facts and an unreasonable application of *Strickland*, *Kimmelman*, and *Davis*. In *Diaz*, the cellphone was taken from the defendant's person incident to arrest. The state court's record shows Juarez seized the cellphone from Hudspath's vehicle while Hudspath was under arrest and locked in a patrol vehicle. Because Juarez did not seize the cellphone from Hudspath's person, it is unreasonable to conclude Juarez relied on *Diaz* to authorize his search. Correspondingly, it is unreasonable to conclude a motion to suppress would have been denied based on a finding the deputy acted in objectively reasonable reliance on *Diaz*.

#### b.      Reliance on the Inventory Exception is unreasonable.

The Supreme Court of Nevada appears to have alternatively determined trial counsel was not ineffective because the police would have inevitably discovered the cellphone contents

during an inventory search of Hudspath's vehicle, citing *Camacho v. State*, 119 Nev. 395, 402, 75 P.3d 370, 375 (2003). That determination is based on an objectively unreasonable determination of the facts because, despite the prosecutor's suggestion that an inventory search may have been conducted, there is no evidence in the state-court record Deputy Juarez or the San Bernardino County Sheriff's Department contemplated, or ever conducted, an inventory search of Hudspath's vehicle. Thus, to the extent the state supreme court relied on inevitable discovery during an inventory search as support for its determination that trial counsel was not ineffective in failing to move to suppress the cellphone contents, its determination is based on an unreasonable determination of the facts in light of the evidence in the state court proceeding.

> **c.    Trial counsel was not ineffective because a motion to suppress lacked merit.**

The state supreme court's determinations are based on unreasonable determinations of facts and an unreasonable application of the warrant exception for searches incident to arrest, so Ground 1 will be reviewed *de novo*. The Court's conclusion would, however, lead to a denial of relief even under AEDPA deferential review. *See Berghuis v. Thompkins*, 560 U.S. 370, 390 (2010).

During Hudspath's trial, the prosecutors explained to the trial court that the search of Hudspath's cellphone did not require a warrant because Hudspath "was under arrest search incident to arrest including the car . . . ." and in California, the warrantless search of a vehicle, based on "probable cause," did not require exigent circumstances.  Deputy Juarez testified he believed California law authorized his search. *See supra*, at pp. 14–15.

Hudspath claims there is a reasonable probability that a motion to suppress the cellphone contents would have been granted because Deputy Juarez could not rely on the search incident to arrest exception for searches of vehicles set forth in the Supreme court's decision in *Gant* as binding appellate precent authorizing the search. (ECF No. 59 at 21–22, 26, 30, 38.) To the contrary, the Court finds Hudspath's claim that trial counsel provided ineffective assistance fails, as would a motion to suppress, because the state court record supports the determination that Deputy Juarez could and did rely on *Gant* to authorize his actions and there is no reasonable probability a motion to suppress had merit and would have been granted.

In California, issues related to the suppression of evidence derived from police searches and seizures are determined by application of federal constitutional law. *People v. Lenart,* 32 Cal. 4th 1107, 1118, 12 Cal. Rptr. 3d 592, 600 (2004). As stated above, the Supreme Court held in *Davis* that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Davis*, 564 U.S. at 239–41. The Supreme Court in *Davis* considered the applicability of the good faith exception to a warrantless search of a vehicle incident to arrest that would have violated the rule in *Gant* had it been conducted post-*Gant*. *Davis*, 564 U.S. at 234–35 (quoting *Gant*, 556 U.S. at 343). *Gant* held, *inter alia*, a warrantless "automobile search incident to a recent occupant's arrest is constitutional . . . if the police have reason to believe that the vehicle contains 'evidence relevant to the crime of arrest.'" *Davis*, 564 U.S. at 234–35 (quoting *Gant*, 556 U.S. at 343).

At the time of the search in Hudspath's case, a California intermediate appellate court had concluded a search of the contents of a cellphone found in a vehicle was authorized under *Gant* based on a reasonable belief the vehicle contained evidence relevant to the crime of arrest—and did so without substituting the probable cause standard in place of *Gant*'s reasonable belief standard. *See People v. Nottoli*, 199 Cal. App. 4th 531, 557, 130 Cal. Rptr. 3d 884, 906 (2011) (holding deputies were authorized under *Gant* to examine text messages, photographs, and e-mails on a smartphone found in arrestee's automobile during a search of the arrestee's automobile incident to arrest based on a reasonable belief evidence relevant to the crime of arrest, i.e., being under the influence of a controlled substance, might be found in the automobile, where a deputy testified, in his experience, drug users and sellers used cellphones as their "main communication" and cellphones could contain text messages related to acquiring and offering drugs); *see also People v. Evans*, 200 Cal. App. 4th 735, 751, 133 Cal. Rptr. 3d 323, 337 (2011) (reasoning, *inter alia*, although "reasonable belief" is often used synonymously with "probable cause," the majority in *Gant* at several points required only a reasonable belief evidence "might" be found).

The Court has found no authority proclaiming whether or not state intermediate appellate precedent constitutes "binding appellate court precedent" for purposes of the exclusionary rule. *See, e.g.*, *United States v. Lara*, 815 F.3d 605, 614 (9th Cir. 2016) ("Even if we were to consider

state intermediate court of appeals decisions to be 'binding appellate precedent' within the meaning of *Davis* (a question we do not decide), a conflict between the state appellate court and the Ninth Circuit with respect to a question in a case that could be brought to either court can hardly be thought to result in 'binding appellate precedent.'") The Ninth Circuit has, however, held in another warrantless search context that the "reason to believe" standard "embodies the same standard or reasonableness inherent in probable cause." *See United States v. Gorman,* 314 F.3d 1105, 1110 (9th Cir. 2002). Because the outcome does not change whether the Court utilizes the more stringent probable cause standard or the arguably less-burdensome "reason to believe" standard used in *Gant*, it will use the probable cause standard for its analysis whether trial counsel provided ineffective assistance in failing to move to suppress the cellphone contents or whether, a motion to suppress is without merit based on Juarez's reasonable reliance on *Gant* for the warrantless search and seizure of Hudspath's cellphone and search of its contents.

In California, an officer has probable cause for a warrantless arrest "when the facts known to the arresting officers 'would lead [an individual] of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime.'" *People v. Frierson,* 25 Cal. 3d 142, 169, 158 Cal. Rptr. 281, 297 (1979); *see also Brinegar v. United States* (1949) 338 U.S. 160, 175–76 (1949) ("Probable cause exists where 'the facts and circumstances within their (the officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed.").

For purposes of determining whether police had probable cause, the reliability of an informant's tip must be considered under the totality of the circumstances. *Illinois v. Gates,* 462 U.S. 213, 230–32 (1983). Probable cause exists as long as the probable "veracity" and "basis of knowledge" of persons supplying hearsay information, combined with the results of independent police investigation, make it reasonably likely, based on the totality of the circumstances, that the information is correct. *Id.* at 238, 241–44 (holding probable cause to search existed when anonymous informant's recitation of detailed facts, corroborated by officers' observation, led them to believe the respondents possessed drugs).

According to Deputy Juarez's trial testimony about the facts known to him at the time of his search of the vehicle and search of the cellphone contents, and the prosecutors' explanations about the basis for the deputy's warrantless search and seizure, it is reasonable to conclude Juarez acted in objectively reasonable reliance on the exception for warrantless searches of a vehicle incident to arrest based on probable cause, and as set forth in *Gant*. *Gant*, 556 U.S. at 343–44.

First, Deputy Juarez developed probable cause to arrest Hudspath for possession of child pornography and probable cause to believe Hudspath's cellphone contained evidence of child pornography before Juarez seized the cellphone and looked at the video.[12] The deputy was invited to the residence in response to calls for a welfare check on Hudspath's two children and to investigate allegations of child pornography located on a phone. During a consensual encounter at the residence, Juarez arrested Hudspath on an unrelated warrant for a probation violation in connection with a vehicle theft and placed Hudspath in the patrol vehicle. Belton then provided Juarez information that corroborated the calls to dispatch and explained that she personally saw child pornography on Hudspath's cellphone the prior night, gave details about the victim and the relationship, and said Hudspath's cellphone was either in the house or in Hudspath's vehicle. *See supra*, at pp. 2–4. The information Juarez possessed as a result of his investigation provided him with facts supporting probable cause to believe Hudspath's cellphone contained child pornography, and with probable cause to immediately arrest Hudspath, who was already under arrest in the patrol vehicle, for possession of child pornography. *Id.* Thus, before searching the vehicle, seizing the cellphone, and viewing its contents, Hudspath was under arrest for possession of child pornography and the deputy had probable cause to believe the evidence of the crime was inside Hudspath's cellphone.

Second, Deputy Juarez's testimony demonstrates Hudspath recently occupied his vehicle in Juarez's presence shortly before the arrest, and that Juarez knew Hudspath had recently occupied the driver's seat of the vehicle because he saw Hudspath exit it when Juarez arrived at the Belton

---

[12]Nevada prohibits a person from knowingly and willfully having in his possession "for any purpose any film, photograph or other visual presentation depicting a person under the age of 16 years as the subject of a sexual portrayal or engaging in or simulating, or assisting others to engage in or simulate, sexual conduct . . . ." NRS § 200.730.

residence shortly before the arrest. After speaking with Belton about her observations of child pornography on Hudspath's cellphone and her indicating the cellphone was either in the house or his vehicle, Juarez went to Hudspath's vehicle and saw, through the open window of the vehicle, the cellphone sitting on the driver's seat in the vehicle. At that point, Juarez had probable cause to believe Hudspath's cellphone was located inside Hudspath's vehicle.

Under these circumstances, a motion to suppress evidence was without merit because the contents of the cellphone were lawfully searched, as the prosecutor's explained to the trial court, in objectively reasonable reliance on then-binding Supreme Court precedent that permitted searches of vehicles incident to arrest for evidence of a crime, including evidence found in containers in the vehicle, based on probable cause, i.e., under *Gant*.[13] As the contents of the cellphone were not subject to suppression under the exclusionary rule, Hudspath cannot demonstrate trial counsel's failure to move to suppress the cell phone contents was deficient and prejudicial as required by *Strickland*. *Davis*, 564 U.S. at 232; *Kimmelman*, 477 U.S. at 375.

For the foregoing reasons, Hudspath is not entitled to federal habeas relief for Ground 1 and an evidentiary hearing is denied.[14] The Court will issue a certificate of appealability for Ground 1 because objectively reasonable jurists could find the Court's assessment of the merits of the constitutional claim in Ground 1 debatable or wrong. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

**B.    Ground 2—Failure to Challenge the Breadth of Warrant**

Hudspath alleges trial counsel provided ineffective assistance in violation of the Fifth, Sixth, and Fourteenth Amendments, by failing to challenge the breadth of the search warrant for the contents of Hudspath's cellphone. He contends he can overcome the procedural default of this claim under *Martinez*. Respondents contend Hudspath failed to show the warrant was overbroad because he did not develop the state court record with a copy of the application for the search

---

[13]Hudspath's reliance on *Coolidge v. New Hampshire*, 403 U.S. 443 (1990) is without merit. (ECF No. 59 at 31–32.) The searches involved in that decision were conducted in 1964, *see id.*, at 455—before the decision in *Gant*.

[14]For the reasons set forth in Ground 1, Hudspath's motion for an evidentiary hearing to further develop a record supporting this claim (ECF No. 60 at 5) is denied because he has failed to "allege[d] facts which, if proved, would entitle him to relief." *Townsend*, 372 U.S. at 312–13; *Insyxiengmay*, 403 F.3d at 671 (stating a claim must be colorable before an evidentiary hearing may be granted).

1    warrant. They contend he fails to show counsel's performance was prejudicial because, even

2    without the videos and photographs, witnesses who saw the videos and photographs could testify

3    to their contents, and R.H. and Detective Dicaro testified about the sexual abuse. Alternatively, the

4    respondents contend the claim must be denied on the merits. Hudspath moves for an evidentiary

5    hearing to develop evidence in support of this claim and Respondents oppose the motion. (ECF

6    Nos. 23 at 13–14; 56 at 30–33; 59 at 38–43; 60 at 6; 61 at 2; 63.) The Court finds Hudspath fails

7    to establish a substantial claim of ineffective assistance of trial counsel to overcome the procedural

8    default of Ground 2, *Martinez*, 566 U.S. at 14, and denies the motion for an evidentiary hearing.

9           Searches conducted under warrants that fail to conform to the particularity requirement of

10   the Fourth Amendment are unconstitutional. *See Stanford v. Texas*, 379 U.S. 476, 485 (1965).

11   When determining whether a warrant authorizing the seizure of a category of items is overbroad,

12   a court must consider: (1) whether probable cause existed to seize all items of a category described

13   in the warrant; (2) whether the warrant set forth objective standards by which executing officers

14   could differentiate items subject to seizure from those which were not; and (3) whether the

15   government could have described the items more particularly in light of the information available

16   at the time the warrant issued. *United States v. Shi*, 525 F.3d 709, 731–32 (9th Cir. 2008). A

17   warrant for electronically-stored information must: (1) "specify the particular crime for which

18   evidence is sought"; (2) prohibit retention of unresponsive information under a "plain-view"

19   doctrine; and (3) protect third party rights by segregating unresponsive information. *United States*

20   *v. Flores*, 802 F.3d 1028, 1044, 1045 (9th Cir. 2015).

21          Where it is claimed a warrant authorized the seizure of items for which there is no probable

22   cause, suppression is generally limited to items seized pursuant to the overbroad part of the

23   warrant. *United States v. Clark*, 31 F.3d 831, 836 (9th Cir. 1994) ("The remedy for an overbroad

24   search warrant is suppression of the seized evidence. The court need suppress, however, only those

25   items seized pursuant to the invalid portion of a search warrant.") (citing *United States v. Gomez–*

26   *Soto*, 723 F.2d 649, 654 (9th Cir. 1984) (embracing "the doctrine of severance, which allows us to

27   strike from a warrant those portions that are invalid and preserve those portions that satisfy the

28   fourth amendment," such that "[o]nly those articles seized pursuant to the invalid portions need be

suppressed."); *but see U.S. v. SDI Future Health, Inc.,* 568 F.3d 684, 707 (9th Cir. 2009) (disapproving severance "'when the valid portion of the warrant is a relatively insignificant part of an otherwise invalid search.").

In Hudspath's case, reasonable jurists would agree that he fails to establish a substantial claim that trial counsel's failure to challenge the search warrant for overbreadth was deficient or prejudicial under *Strickland*. *Martinez*, 566 U.S. at 14. Under the severance doctrine, even if the warrant, which is not included in the state court record, is overbroad, the child pornography videos taken from Hudspath's cellphone would not have been excluded. As discussed, there was probable cause to search for the child pornography on the cellphone. *See supra*, at pp. 2–4, 18–22. Hudspath specifies no other inculpatory items seized from the cellphone and used as evidence at trial that could have been suppressed as the product of an overbroad search warrant. Thus, Hudspath fails to establish there is any merit to a claim that trial counsel's failure to challenge the warrant for overbreadth fell below an objective standard of reasonableness and, but for counsel's failure, there is a reasonable probability the result of the proceedings would have been different, as required by *Strickland*. Accordingly Hudspath fails to overcome the procedural default within the meaning of *Martinez,* 566 U.S. at 14. Ground 2 will be dismissed with prejudice.[15]

### C.  Ground 3—Testimony about Prior Incarceration

Hudspath alleges trial counsel provided ineffective assistance in violation of the Fifth, Sixth, and Fourteenth Amendments, by eliciting testimony from Williams that Hudspath has "always been incarcerated." Hudspath claims the testimony was prejudicial and inflammatory as it portrayed Hudspath as a career criminal. He claims counsel was ineffective because counsel failed to seek a curative instruction directing the jury to disregard the statement, or present evidence Hudspath had not always been incarcerated. Hudspath contends he can overcome the procedural default of this claim under *Martinez*. Respondents argue the claim is insubstantial as trial counsel declined a curative instruction believing it would do more harm than good, and

---

[15]Hudspath's motion for an evidentiary hearing to further develop a record to support Ground 2 (ECF No. 60 at 5) is denied because he has failed to "allege[d] facts which, if proved, would entitle him to relief." *Townsend*, 372 U.S. at 312–13; *Insyxiengmay*, 403 F.3d at 671.

Hudspath was not prejudiced. (ECF Nos. 23 at 14–15; 56 at 33–34; 59 at 44–46.) The Court finds Hudspath fails to establish a substantial claim that trial counsel's performance was prejudicial under *Strickland*. *Martinez*, 566 U.S. at 14.

"Reference to a defendant's prior criminal history may be reversible error." *Collman v. State*, 116 Nev. 687, 705, 7 P.3d 426, 437 (2000) (finding inadvertent testimony suggesting defendant had been in jail was improper but harmless); *see also Thomas v. State*, 114 Nev. 1127, 1142, 967 P.2d 1111, 1121 (1998) (holding comment the defendant was in jail constituted harmless error because the evidence against the defendant was overwhelming, the comment was unsolicited by the prosecutor and inadvertently made, and the defendant declined the court's offer to admonish the jury); *Rice v. State*, 108 Nev. 43, 44, 824 P.2d 281, 282 (1992) (holding failure to grant motion for mistrial based on witness testimony about defendant's prior criminal activity was error because such evidence affects the presumption of innocence and violates due process but concluding the error was "harmless beyond a reasonable doubt" because "the statements were unsolicited, the references were inadvertent, and defense counsel declined the judge's offer to give the jury a limiting instruction") (citing *Chapman v. California,* 386 U.S. 18 (1967)).

At Hudspath's trial, his counsel elicited Williams's testimony that the two children she had with Hudspath lived with her exclusively since 2010. When counsel asked, "In that time from 2010 until now, has there ever been any talk between you and Mr. Hudspath regarding custody arrangement," Williams replied, "No." Counsel next asked, "You guys didn't want to go to court; correct, and make it official, for lack of a better term?" Williams replied, "There has never been an opportunity to have that kind of talk because he's always been incarcerated." Defense counsel requested a bench conference and the parties discussed Williams's testimony:

> DEFENSE COUNSEL: I wasn't trying, but she did mention incarceration.
>
> THE STATE: Well you kind of pushed pretty far about why they haven't had a discussion when he's been in prison their entire relationship.
>
> DEFENSE COUNSEL: I didn't anticipate that the discussion didn't happen because of jail.
>
> THE COURT: I was wondering when that was going to pop. Okay. So—
>
> DEFENSE COUNSEL: I can end that line of questioning at this point. Sorry.

THE STATE: Don't let on we just—okay. Just have to instruct them to—or not. Your decision.

DEFENSE COUNSEL: I'm going to leave it alone.

THE STATE: They do know he was taken into custody on our case because I did say he was arrested.

DEFENSE COUNSEL: Yeah. I mean—it's fine. I will move on. I'm just fine with one question. Thank you.

(ECF No. 50-8 at 151–55.)

The claim that trial counsel was ineffective is insubstantial as all reasonable jurists would agree the State presented overwhelming and powerful evidence of guilt for the crimes charged, including videos extracted from Hudspath's cellphone that depicted Hudspath sexually abusing six-year-old R.H., and family members and close friends identified R.H. and Hudspath in the videos. Given the overwhelming evidence of guilt for the crimes of conviction and the jury's verdict acquitting Hudspath of Count 7, there is no merit to the claim that there is a reasonable probability the result of the proceedings would have been different but for counsel's eliciting Williams's testimony about Hudspath's prior incarceration. Ground 3 will be dismissed with prejudice as Hudspath fails to overcome the procedural default.

**D.     Ground 4—Failure to Object to Repetitive Publication of Child Pornography**

Hudspath alleges trial counsel provided ineffective assistance in violation of the Fifth, Sixth, and Fourteenth Amendments, by failing to object to repetitive publication of the child pornography videos and photographs on the grounds that it was unnecessary and more prejudicial than probative. He contends he can overcome the procedural default of this claim under *Martinez*. Respondents argue trial counsel challenged the prosecution's repetitive publication of the videos to the jury, the videos were repeatedly introduced so the witnesses could identify Hudspath because the primary issue at trial was the identity of the perpetrator of the sexual abuse depicted in the videos, and Hudspath was not prejudiced due to the overwhelming evidence of guilt. (ECF Nos. 23 at 15–16; 56 at 35–36; 59 at 47–48.) The Court finds Hudspath fails to establish a substantial claim that trial counsel was ineffective. *Martinez*, 566 U.S. at 14.

Relevant evidence is not admissible if its "probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues or of misleading the jury," and "may be excluded if its probative value is substantially outweighed by considerations of undue delay, waste of time or needless presentation of cumulative evidence." NRS § 48.035(1) and (2).

For nonconstitutional errors, such as the erroneous admission of evidence, reversal is warranted if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Harris v. State*, 134 Nev. 877, 882–83, 432 P.3d 207, 212 (2018) (holding probative value of gruesome photographs of the victims' charred bodies splayed across an autopsy table was substantially outweighed by the danger of unfair prejudice but error was harmless)(citing *Knipes v. State,* 124 Nev. 927, 935, 192 P.3d 1178, 1183 (2008) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)); *State v. Eighth Judicial Dist. Court (Armstrong),* 127 Nev. 927, 933, 267 P.3d 777, 781 (2011) (stating, because all evidence against the defendant is prejudicial, the focus is on "unfair prejudice," which has been defined in Nevada "as an appeal to 'the emotional and sympathetic tendencies of a jury, rather than the jury's intellectual ability to evaluate evidence.'").

During Hudspath's trial, the State showed witnesses and the jury four videos (State's Exhibits 1–4), and corresponding still photographs, depicting sexually explicit activities between an adult male and a female child on two separate dates: State's Exhibit 1 depicted activities on December 29, 2013, and State's Exhibits 2–4 depicting activities on January 19, 2014. State's Exhibit 1 was played in its entirety during Deputy Juarez's testimony. Although defense counsel objected, State's Exhibit 1 was replayed so Juarez could determine whether he recognized the male voice in the video. The trial court permitted the State to "bring the [laptop] to the deputy so he can listen to it on the lap top speakers." Juarez identified Hudspath's vehicle and his belly button in photographs taken from the videos. (ECF Nos. 50-8 at 21, 32–35; 50-9 at 41–42.)

State's Exhibit 1 was played for Belton who testified she saw it on Hudspath's cellphone in March of 2014. A "little snippet of" State's Exhibit 1 was also played for Belton who said she heard Hudspath use R.H.'s nickname. State's Exhibits 2–4 were played for Belton who testified she recognized R.H., and Hudspath's voice and belly button. Belton and James identified Hudspath's vehicle, belly button, and R.H. in still photographs taken from the videos. The State

played "a very brief clip" of State's Exhibit 1 for James who recognized Hudspath's voice and heard him use R.H.'s nickname. A "snippet" of State's Exhibit 1 was played for Williams, who recognized Hudspath's voice. Williams also identified Hudspath's vehicle, belly button, penis, watch, jacket, R.H., and her mother's couch and lamp in photographs corresponding to the videos. A "clip" of State's Exhibit 1's audio was played for Hardy who identified Hudspath's voice. Hardy identified her living room and R.H. in photographs taken from the videos. (ECF Nos. 50-8 at 68–74, 103–17, 134–46; 50-9 at 81–96.)

The State proposed to show clips of the video exhibits for Detective Stafford so he could testify whether he saw them on Hudspath's cellphone, but trial counsel objected, "We're getting close to overkill with the videos. I know they've been admitted. Are we just showing a clip to identify?" The State clarified it would show him "only clips," not the entire video, and agreed to "just show the beginning" so Stafford could confirm whether he saw the videos. Defense counsel agreed with that arrangement. Stafford identified clips of State's Exhibits 1–4 as videos, and corresponding photographs from the videos, he saw on Hudspath's cellphone. The State played State's Exhibit 3 for Stafford "a little bit longer" so Stafford could focus on the watch in the video. (ECF No. 50-9 at 11–17.)

Before the State introduced the videos during Detective Helmick's testimony, trial counsel objected, and the State indicated it would not play the videos; rather, it would show only the photograph depicting the file name of each video. Helmick identified the names and dates of State's Exhibits 1–4, and corresponding photographs, as having originated in Hudspath's cellphone. When the State attempted to ask Helmick to identify each of several individual photographs corresponding to those videos, defense counsel avoided repetition by stipulating the photographs came from the videos. (*Id.* at 39–43, 59–68.)

All reasonable jurists would agree Hudspath fails to establish, for purposes of overcoming the procedural default of this claim within the meaning of *Martinez*, a substantial claim that trial counsel's performance was deficient and prejudicial under *Strickland*. 566 U.S. at 14. The videos and corresponding photographs were directly probative whether the State proved the crimes charged, i.e., whether Hudspath was the individual perpetrating the sexual assaults and whether he

created and possessed the videos. Trial counsel successfully objected to repetitive displays of the videos and photographs. Although each publication of the videos and photographs may not have been strictly necessary, repeat showings of the videos and corresponding photographs did not undermine the juror's intellectual ability to evaluate the evidence. The jury found Hudspath not guilty of one charge (Count 7) of attempted lewdness with a child under 14. And, even if the videos and photographs had been shown only once to each witness, there is no reasonable probability the result of the proceeding would have been different. There was overwhelming testimony identifying Hudspath as the perpetrator, R.H. as the victim, and demonstrating Hudspath created and possessed the videos. Hudspath thus fails to demonstrate trial counsel's performance was deficient, that but for counsel's failure to make additional objections, there is a reasonable probability a reduction in the publication of videos and photographs would have changed the outcome of the proceedings, or the repeat showings had a substantial and injurious effect or influence in determining the jury's verdict such as to deny Hudspath a fair trial. Hudspath has not overcome the procedural default and Ground 4 will be dismissed with prejudice.

### E.      Ground 5—Prosecutorial Misconduct

Hudspath alleges the trial court violated his right to a fair trial and due process guaranteed by the Fifth, Sixth, and Fourteenth Amendments, by allowing the prosecutor to commit misconduct in closing argument. First, he alleges the prosecutor personally vouched for Detective Dicaro. Second, Hudspath alleges the prosecutor improperly remarked that Hudspath celebrated Valentine's Day by placing pornographic photographs of R.H. into a folder on his cellphone, and stated, "I guess he was giving himself a Valentine's Day present to reorganize his photo gallery with child porn in it." Finally, Hudspath alleges the prosecutor overstated the weight of the evidence by arguing, "Defendant lost his mind, he went crazy, berserk when they found that phone. He was freaking out." Respondents counter the prosecutor did not vouch for Dicaro, closing argument was based on permissible inferences drawn from the evidence that did not render the trial unfair or deny Hudspath due process, and the evidence of guilt was overwhelming. (ECF Nos. 23 at 16–17; 56 at 22–25; 59 at 49–56.)

The Supreme Court has warned two dangers are posed when a prosecutor vouches for the credibility of a witness and expresses a personal opinion on the guilt of the accused: (1) "such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury"; and (2) "the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Young*, 470 U.S. 1, 18–19 (1985) (citing *Berger v. United States*, 295 U.S. 78, 88–89 (1935)).

For purposes of determining whether the prosecution engaged in misconduct by vouching for a witness, the Ninth Circuit has stated a court must consider (1) the form of vouching; (2) the extent the vouching implies the prosecutor has extra-record knowledge of or a capacity to monitor the witness's truthfulness; (3) inferences the court is monitoring the witness's veracity; (4) the degree of personal opinion asserted; (5) the timing of the vouching; (6) the extent to which the witness's credibility was attacked; (7) the specificity and timing of a curative instruction; and (8) the importance of the witness's testimony and the vouching to the case overall. *United States v. Necoechea*, 986 F.2d 1273, 1278 (9th Cir. 1993), *as amended on denial of reh'g* (Apr. 15, 1993).

To determine whether a prosecutor's comments rise to the level of a due process violation, courts examine the prosecutor's remarks in context based on the entire proceedings. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). Factors to consider when determining whether a prosecutor's comment "rendered a trial constitutionally unfair," include: (1) whether the comment misstated or manipulated the evidence; (2) whether the judge admonished the jury to disregard the comment; (3) whether defense counsel invited the comment; (4) whether defense counsel had an adequate opportunity to rebut the comment; (5) the prominence of the comment in the context of the entire trial; and (6) the weight of the evidence. *Hein v. Sullivan*, 601 F.3d 897, 912–13 (9th Cir. 2010) (citing *Darden v. Wainwright*, 477 U.S. 168, 182 (1986)).

To warrant habeas relief, acts of prosecutorial misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)). The standard is general, leaving courts "more leeway . . . in reaching outcomes in case-by-case determinations . . . ." *Parker v. Matthews*, 567 U.S. 37, 48 (2012) (quoting *Yarborough*, 541 U.S. at 664).

In closing argument at Hudspath's trial, the prosecutor emphasized, for purposes of Count 7, Detective Dicaro's testimony concerning R.H.'s allegations of sexual abuse in a courtyard:

> [W]e know that outside the apartment complex in the courtyard by the tree he fondled R.H.'s genitals.
> . . . .
> You heard from Detective Dicaro and he explained the process he goes through when he's conducting a[n] interview of a child and it's a very specific interview and how it's supposed to elicit truthful responses. He explained what she said. He was also able to corroborate what she said as well because he was in that courtyard and he did see a tree, and that makes sense based on all the other circumstances as well. It makes sense because it happened.

(ECF No. 50-10 at 11–12.) The trial court immediately called a bench conference and warned the prosecutor to be sure she was "not commenting on the credibility [of] the witness" and to "be careful about [his] opinion." *Id.* The trial court elsewhere instructed the jury: "Statements, arguments and opinions of counsel are not evidence in the case." (ECF No. 29-16 at 12.)

The prosecutor argued Hudspath reorganized the child pornography files on February 14, 2014, as a Valentine's Day gift to himself:

> [T]he parties have stipulated that State's Exhibit 1 through 4 are films or other visual presentations depicting a child or depicting a person under the age of 16 as the subject of a sexual portrayal or engaging or stimulating [sic] or assisting others in engaging in or stimulating [sic] sexual conduct. That's already proven. I'm not even going to talk about that. It's stipulated to; it's proven. Those videos are child pornography.
>
> So, the only thing we need to talk about is possession. How do we know that the Defendant was in possession of those videos? Well once the video is recorded, they were on it, they were in his possession. He recorded them and then he kept them in his possession. And we know he had it in possession all the way going into March because the police found them on his phone on March 27[th], 2014. He could have deleted them. If he would have deleted them he would have no longer been in possession of them, but he didn't. Again, they're located on his phone. And this [is] important too because he's had possession in both Las Vegas and Victorville. In Victorville, obviously, when he was arrested with the phone for these charges, he had it in his hand. I'm sorry. He had it in his car. And in Las Vegas, as we said, you're obviously in possession of something if you take a photograph or you take a picture or you take a video of something you're in possession of it after

you have it. It's simple, it's clear.

We also know based on Detective Helmick's interview—based on Detective Helmick's examination of the phone that those photographs was [sic] actually reorganized on February 14, 2014. You heard from him and he talked about what that modified [indiscernible] meant, that they would have been switched from folder to folder or switched to different devices. So, on Valentine's Day the Defendant didn't [sic] them. I guess he was giving himself a Valentine's Day present to reorganize his photo gallery with child porn in it. I submit to you the only reasonable verdicts [sic] is a verdict of guilty one [sic] count[s] 13, 14, 15, and 16.

(ECF No. 50-10 at 15–16.)

During closing argument, the prosecutor argued Hudspath's reaction when the police seized his cellphone from his vehicle exhibited consciousness of guilt:

How do we know the Defendant committed this crime? Well the videos are on his phone.
. . . .
Defendant's actions when his phone was located. And we heard from Daimon and we also heard from Deputy Juarez who explained how the Defendant lost his mind, he went crazy, berserk when they found that phone. He was freaking out. And that's important because, if you remember, the day before on March 19th he had left his phone unattended when he was drunk. Everybody was drinking and everybody was having a good time and listening to music. He was drunk. He forgot what was on his phone. He didn't forget on March 20th when the police showed up and they took that phone. He knew what was on it and he lost his mind . . . .

(*Id.* at 17–18.)

On direct appeal, the Supreme Court of Nevada denied allegations the prosecutor committed misconduct by (1) by vouching for Dicaro; and (2) arguing Hudspath reorganized his photo gallery of child pornography as a Valentine's Day gift:

*Prosecutorial misconduct in closing*

In determining prosecutorial misconduct, we assess whether improper conduct occurred, and if it did, whether it warrants reversal. *Valdez v. State,* 124 Nev. 1172, 1188, 196 P.3d 465, 476 (2008). To warrant reversal, the prosecutorial misconduct must have substantially affected the jury's verdict. *Id.* at 1189, 196 P.3d at 476. Further, "[t]he level of misconduct necessary to reverse a conviction depends upon how strong and convincing is the evidence of guilt." *Rowland v. State,* 118 Nev. 31, 38, 39 P.3d 114, 118 (2002) (internal quotation omitted).

Hudspath alleges two instances of prosecutorial misconduct: witness vouching and a comment about Valentine's Day that Hudspath argues improperly disparaged the defense. The prosecutor's statements respecting Detective Dicaro did not constitute witness vouching because the State neither placed the prestige of the government behind Dicario [sic] nor indicated that evidence not presented to the jury supported Dicario's [sic] testimony. *Id.* at 39, 39 P.3d at 119; *Lisle v. State,* 113 Nev. 540, 553, 937 P.2d 473, 481 (1997), *clarified on denial of reh'g,* 114 Nev.

221, 954 P.2d 744 (1998). As for the Valentine's Day comment, the question is closer. While the comment was provocative, it did not cross the line between legitimate inference and misconduct. And, even treating the comment as misconduct, it was not of constitutional dimension because it did not remark upon Hudspath's constitutional rights nor so inflame the jury to deprive Hudspath of his due process rights. Given the weight against him, the State's arguably inappropriate comment was harmless.

Also on direct appeal, the Supreme Court of Nevada ruled the trial court did not err in allowing

testimony about Hudspath's reaction to the seizure of his cellphone:

> *Admitting evidence of Hudspath's reaction*
>
> Hudspath next argues that the district court erred by admitting testimony regarding his reaction to the police officer discovering his cellphone because the danger of unfair prejudice substantially outweighed the evidence's probative value. *See* NRS 48.035(1). Because Hudspath failed to object at trial, he waived all but plain error review. The evidence demonstrated Hudspath's state of mind when Deputy Juarez confiscated the cellphone, eliminating any question as to whose phone it was and Hudspath's knowledge of its contents. Thus, plain error does not appear.

(ECF No. 17-5 at 4–5.)

### 1.    Remarks about Dicaro's Testimony for Count 7

The state supreme court reasonably determined the prosecutor's remarks about Dicaro's testimony concerning R.H.'s allegation that Hudspath sexually abused her in a courtyard did not vouch for Dicaro. The remarks neither placed the prestige of the government behind Dicaro's testimony, nor indicated the existence of evidence not presented to the jury. The argument that it "made sense" that the abuse alleged in Count 7, in a courtyard near a tree, occurred because R.H.s showed the tree to Dicaro, was based on the testimony presented at trial. (See ECF No. 29-15 at 23.) The trial court admonished the prosecutor not to vouch for the credibility of the witness and to watch out for conveying opinion and failed to simultaneously instruct the jury to disregard the remark. However, the trial court elsewhere instructed the jury that the remarks of counsel are not evidence. Ultimately, the remark did not so infect the trial with unfairness as to make the resulting convictions a denial of due process because the jury acquitted Hudspath of Count 7, which is the allegation corresponding to the allegation of abuse in a courtyard.

### 2.    Remarks about Valentine's Day Gift

The state supreme court reasonably determined the remark that Hudspath reorganized his

child pornography as if giving himself a gift for Valentine's Day, was based on the evidence and legitimate inferences to be drawn from that evidence. Detective Helmick testified child pornography was placed in a folder on the cellphone entitled "Bluetooth" on February 14, 2014. Defense counsel had the opportunity to respond in the defense closing remarks. The judge instructed the jury to disregard the opinions of counsel. And the comment did not hold a prominent place in the trial. It was furthermore objectively reasonable to conclude, given the weight of the evidence, i.e., Hudspath's possession of the sexually explicit child pornography videos, the videos themselves, and identifications of Hudspath as the male in the videos; that the prosecutor's remarks, even if misconduct, did not so infect the trial with unfairness as to make the resulting convictions a denial of due process.

### 3.    Remarks about Reaction to Seizure of Cellphone

Hudspath argued on direct appeal in his summary of his argument that the prosecutor made inflammatory argument disparaging him by insinuating Hudspath violently banged his head against the window to retrieve his phone, thereby showing his guilt. Hudspath also alleged the trial court failed to suppress the remarks. The Supreme Court of Nevada did not expressly address the claim the prosecutor committed misconduct in arguing Hudspath's reaction to Deputy Juarez's seizure of the cellphone was evidence of guilt. (*See* ECF No. 17-2 at 12, 21–23.)

The Supreme Court has held, where a petitioner fairly presented a claim to the state court, and the state court addressed a related claim, but did not expressly acknowledge it decided the claim in question, a federal habeas court "must presume that the federal claim was adjudicated on the merits." *Johnson v. Williams*, 568 U.S. 289, 301 (2013). Where no decision from the state court explains its underlying reasoning, a federal habeas court must "engage in an independent review of the record" to determine whether the state court's decision on the claim was "objectively unreasonable." *Kipp v. Davis*, 971 F.3d 939, 948 (9th Cir. 2020) (citing *Murray v. Schriro*, 882 F.3d 778, 802 (9th Cir. 2018) (quoting *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (relying on *Richter*, 562 U.S. at 99–101)). "This is not de novo review"; rather, it must be determined "what arguments could have supported the state court's decision and assess whether fairminded jurists could disagree whether those arguments are unreasonable." *Kipp*, 971 F.3d at 948; *see also*

*Richter*, 562 U.S. at 102.

The Supreme Court of Nevada could reasonably determine the prosecutor committed no misconduct because the remarks were based on the evidence and reasonable inferences that could be drawn from the evidence. Juarez testified that when he returned to the residence with Hudspath's cellphone, he heard Hudspath "screaming at the top of his lungs and yelling from [Juarez's] patrol vehicle." Belton and James each testified they saw Hudspath's reaction and Belton said he was "yelling and hitting his head on the window" of the police car when Juarez took the phone from Hudspath's vehicle. Thus, the prosecutor's argument did not materially misstate or manipulate the evidence. Defense counsel had the opportunity to argue there was another reason for Hudspath's reaction to the seizure of his cellphone. The trial court also instructed the jury that the argument of counsel is not evidence. Given the weight of the evidence, the Supreme Court of Nevada could reasonably conclude the remark did not so infect the trial with unfairness as to make the resulting convictions a denial of due process. Hudspath is not entitled to federal habeas corpus relief for Ground 5.

## F.    Ground 6—Failure to Object to Prosecution's Closing Remarks

Hudspath alleges trial counsel provided ineffective assistance by failing to object to the prosecutor's remarks in the three instances alleged in Ground 5 of the petition, and by additionally failing to object to the prosecutor's remarks stating the voice on a video "is definitely the Defendant's voice" and "[t]his Case would be a terrible episode of CSI or NCIS or SVU or any combination of letters because every piece of evidence points to one person." All five of these instances of alleged IAC for failure to object to the prosecutor's remarks are unexhausted, but Hudspath contends he can overcome the procedural defaults under *Martinez*. Neither Hudspath nor the respondents addressed the merits of instances of IAC corresponding to the prosecutor's remarks alleged in Ground 5. Respondents contend the prosecutor's argument was based on the evidence, and the evidence of guilt was overwhelming. (ECF Nos. 17-10; 23 at 16–18; 56 at 22–25, 36–37; 59 at 49–58.) The Court finds Hudspath fails to establish any of his five allegations of trial counsel IAC for failure to object to the prosecutor's argument constitutes a substantial claim within the meaning of *Martinez*. 566 U.S. at 14.

During jury selection one of the prosecutors asked venirepersons whether they watched television shows CSI, NCIS, and SVU. The prosecutor asked whether one of the venirepersons had seen the episode "where they get fingerprints off running water," and elicited agreement such an outcome could not be expected in a real-life situation. At recess, one prospective juror, who eventually served on the jury, told the prosecutors her favorite shows are NCIS, CSI and SVU, and then left the courtroom. The prosecutor made no reply. Defense counsel saw the interaction and would make nothing "further about it." (ECF Nos. 29-10; 29-11 at 8–9, 22–23, 33.) The prosecutor argued in closing remarks that Hudspath's voice was "definitely" on the video from outside because his voice was identified by multiple people:

> How do we know the Defendant committed this crime? Well the videos are on his phone. [R.H.] told you herself what happened. She told you and she told Detective Dicaro and Detective Dicaro came in here and explained exactly what happened. Same voice. His voice was identified by multiple people throughout the entire course of this trial. The voice on that video from outside is definitely the Defendant's voice.

(ECF No. 50-10 at 17.) Defense counsel responded by arguing the jury heard only "muffled recordings" and no expert testified the recordings were of Hudspath voice. (*Id.* at 20–21.)

In response to the defense arguments that the State failed to prove Hudspath was the man with R.H. in the sexually explicit videos, the prosecutor argued in rebuttal closing that all of the evidence points to Hudspath, making it a terrible case for an episode of CSI, NCIS or SVU:

> What did the State give you to prove identity? Pretty much everything but a silver platter. Because, number one, you have a video; number two, you have direct evidence from the six-year-old child; number three, you have several witnessed identifying voices, cars, belly buttons, shoes, watches, and a weird veiny thing on a penis. So, the State's pretty much given you everything . . . . This case would be a terrible episode of CSI or NCIS or SVU or any other combination of letters because every piece of evidence points to one person. There is no excitement or mystery or intrigue.

(ECF No. 50-10 at 24.)

All reasonable jurists would agree Hudspath fails to establish a substantial claim that trial counsel rendered ineffective assistance based on any of the five allegations of trial counsel IAC for failure to object to the prosecutor's argument. First, trial counsel's failure to object to the prosecutor's remarks about the allegations concerning abuse in a courtyard did not prejudice

Hudspath as he was acquitted of the charge corresponding to the allegations of abuse in the courtyard, i.e., Count 7. Second, an objectively reasonable trial attorney could choose not to object to the remarks about Valentine's Day so as not to draw attention to the remarks and because Melnick testified police found a folder containing pornography depicting R.H. was established on Hudspath's cell phone on February 14th. Third, an objectively reasonable attorney could determine objection to Hudspath's reaction to the seizure of the cellphone was futile as the remarks were fair commentary on the testimony of Juarez, Belton, and James. Fourth, an objectively reasonable trial attorney could conclude the argument "the video from outside is definitely the Defendant's voice" was based on the abundance of testimony Hudspath's voice could be heard on the videos. Finally, an objectively reasonable trial attorney could conclude the prosecutor's argument the case would make a terrible episode for CSI, NCIS, or SVU constitutes fair argument in response to defense counsel's closing argument that other men were not investigated for the crimes, and was fair commentary on the evidence, which overwhelmingly identified Hudspath as the male on the videos. There is also no reasonable probability the result of the proceeding would have been different had counsel objected to one or all five of the prosecutor's remarks as there was overwhelming video, photographic, and testimonial evidence establishing Hudspath's guilt for the crimes for which he was convicted. Based on the totality of the circumstances, there is no merit to the claims, either individually or collectively, that trial counsel's failure to object to the prosecutor's remarks was ineffective assistance according to *Strickland*. Hudspath has failed to overcome the procedural default of his claim and therefore Ground 6 will be dismissed with prejudice.

### G.    Ground 7—Failure to Move to Dismiss Count 3 as Duplicative of Count 2

Hudspath alleges trial counsel provided ineffective assistance in violation of the Fifth, Sixth, and Fourteenth Amendments by failing to move to dismiss Count 3 as duplicative of Count 2 or move for acquittal of Count 3. He claims the allegations for those counts were based on a video recording of a single uninterrupted incident. He contends he can overcome the default under *Martinez*. Respondents contend a motion to dismiss Count 3 as duplicative was futile as the question whether the video recording depicted one or two acts was a question of fact for the jury.

(ECF Nos. 23 at 19; 56 at 37–38; 59 at 58–61.) The Court finds Hudspath cannot overcome the procedural default because he fails to establish a substantial claim that trial counsel provided ineffective assistance.

In Nevada, a trial court may, "at any time after the evidence on either side is closed," deem "the evidence insufficient to warrant a conviction," and "advise the jury to acquit the defendant," however, "the jury is not bound by such advice." NRS § 175.381(1). Following a guilty verdict, the trial court or the defendant may move to "set aside the verdict and enter a judgment of acquittal if the evidence is insufficient to sustain a conviction." NRS § 175.381 (2).

According to *Jackson v. Virginia*, a jury's verdict must stand if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could find the essential elements of the offense beyond a reasonable doubt." 443 U.S. 307, 319 (1979) (emphasis in original). The *Jackson* standard is applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Id.* at 324 n.16. A reviewing court, "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any conflicts in favor of the prosecution, and must defer to that resolution." *Id.* at 326.

In Hudspath's case, Count 2 of the amended information alleged, as depicted in video, that Hudspath committed sexual assault of a minor under the age of 14 by placing his penis in R.H.'s mouth on January 19, 2014, at 3:32 a.m. Count 3 alleged, as depicted in video, sexual assault of a minor under the age of 14 by placing his penis in R.H.'s mouth on the same date at 3:43 a.m. (ECF No. 50-10 at 8–9.) At the relevant time, sexual assault was defined in Nevada by NRS § 200.366(1):

> A person who subjects another person to sexual penetration, or who forces another person to make a sexual penetration on himself or herself or another . . . against the will of the victim or under conditions in which the perpetrator knows or should know that the victim is mentally or physically incapable of resisting or understanding the nature of his or her conduct, is guilty of sexual assault.

NRS § 200.366(1), *as amended by* Laws 2007, c. 528 § 7.

At trial, Detective Dicaro testified R.H. told him about three episodes of abuse, i.e., in her home, in a parking lot, and in a courtyard. (ECF No. 50-9 at 155–57.) Dicaro said R.H. told him

Hudspath would stop so her brothers would not see what was going on. (*Id.*) Witnesses identified Hardy's residence, Hudspath, and R.H., in State's Exhibits 2–4, dated January 19, 2014. *See supra*, at pp. 4–5.

Jury Instruction No. 19 explained to the jury how to determine whether a sexual assault constitutes a single or may be considered multiple acts:

> Where multiple sexual acts occur as part of a single criminal encounter, a defendant may be found guilty for each separate or different act of sexual assault or lewdness.
>
> Where a defendant commits a specific type of act constituting sexual assault or lewdness he may be found guilty of more than one count of that specific type of act of sexual assault or lewdness if:
>
> 1. there is an interruption between the acts which are of the same specific type, or
>
> 2. where the acts of the same specific type are interrupted by a different specific type of sexual assault.
>
> Only one sexual assault occurs when a defendant's actions were of one specific type of sexual assault, and those acts were continuous and did not stop between the acts of that specific type.

(ECF No. 29-16 at 24.) The defense's objection to Instruction No. 19, that State's Exhibits 2 and 3 depicted a single act, was overruled. (ECF Nos. 50-9 at 183–84; 50-10 at 3–5.)

In closing remarks, the State argued the sexual abuse depicted in two of the videos, as alleged in Counts 2 and 3, were of two different acts based on R.H.'s statement Hudspath would stop so her brothers would not see what he was doing to her. Defense counsel countered that "[t]he State has not shown other than a stoppage of the recording that there're [sic] were two separate acts," and "there should not be a Count 3." (ECF No. 50-10 at 10–11, at 23.)

On direct appeal, the Supreme Court of Nevada determined the trial court did not abuse its discretion by giving Instruction No. 19 as it was a question for the jury whether the videos depicted a single or separate acts:

> *Abuse of discretion in giving jury instruction 19*
>
> Because the district court has broad discretion to settle jury instructions, an abuse of discretion only occurs when "the district court's decision is arbitrary or capricious or if it exceeds the bounds of law or reason." *Jackson v. State,* 117 Nev. 116, 120, 17 P.3d 998, 1000 (2001). The district court's decision to provide jury instruction 19 was neither because the separate cellphone files reasonably

demonstrated separate acts, which was, on this record, a question of fact for the jury. Thus, there is no abuse of discretion here.

(ECF No. 17-5 at 5.)

Hudspath fails to establish a substantial claim of IAC, within the meaning of *Martinez*. As the Supreme Court of Nevada explained in Hudspath's direct appeal, it was a question of fact for the jury's determination whether Count 3 duplicated Count 2. At trial, defense counsel argued to the jury that Count 3 was duplicative of Count 2 because the State merely proved the video recording stopped; not that there was more than one continuous act. Because it is presumed that conflicting inferences are resolved by a jury verdict, *Jackson v. Virginia*, 443 U.S. 307, 326 (1979), Hudspath cannot establish a substantial claim that trial counsel's failure to move for acquittal on Count 3, based on an argument that Count 3 was duplicative of Count 2, was deficient or prejudicial under *Strickland*.[16] Hudspath fails to overcome the procedural default of his allegations in Ground 7, and it will be dismissed with prejudice.

### H.    Ground 8—Stipulation to Jury Instructions for Counts 13–16.

Hudspath alleges he was deprived effective assistance of counsel in violation of the Fifth, Sixth, and Fourteenth Amendments, when trial counsel agreed to Jury Instruction No. 26 because the instruction allegedly implied his admission of guilt for Counts 13–16. He contends he can overcome the default of this claim under *Martinez*. Respondents argue Hudspath fails to establish a substantial claim as the stipulated instruction was clear and even if it was not clear, the parties made it clear in closing remarks that the instruction did not stipulate Hudspath was the perpetrator depicted in the videos. (ECF Nos. 23 at 19–20; 56 at 38–40; 59 at 61–63.) The Court finds Hudspath fails to overcome the procedural default of this claim because he fails to establish a substantial claim that trial counsel was ineffective.

Counts 13–16 alleged Hudspath was guilty of possession of visual presentations depicting sexual conduct of a child with an adult male as contained in the four videos marked State's Exhibits 1–4. (ECF No. 29-12 at 6–7.) Jury Instruction Nos. 25 to 27 addressed the allegations and stated the parties stipulated State's Exhibits 1–4 constituted child pornography:

---

[16]*See also* Ground 10.

A person who knowingly and willfully has in his possession for any purpose any film, photograph or other visual presentation depicting a person under the age of 16 years as the subject of a sexual portrayal or engaging in or simulating, or assisting others to engage in or simulate, sexual conduct is guilty of the crime of Possession of Visual Presentation Depicting Sexual Conduct of a Child.

"Sexual portrayal" means the depicting of a person in a manner which appeals to the prurient interest in sex and which does not have serious literary, artistic, political or scientific value.

"Prurient" means provoking lustful thoughts over and beyond those that would be characterized as normal.

The parties stipulate that State's Exhibits 1 through 4 are films, or other visual presentations depicting a person under the age of 16 years as the subject of a sexual portrayal or engaging in, or simulating, or assisting others to engage in or simulate, sexual conduct.

The parties further stipulate to the file names associated with these films and the described conduct as set forth in counts 13 through 16 of the Information.

If the parties stipulate to the existence of a fact, you must accept the stipulation as evidence and regard that fact as proved.

(ECF No. 29-16 at 30–32.)

In closing remarks, the State argued that, although the parties stipulated the videos are child pornography, the State must prove beyond a reasonable doubt that Hudspath possessed the video:

And let's talk about that last charge. Possession of visual presentation depicting sexual conduct of a child. And, again, that's just a fancy name for possession of child porn. Counts 13 through 16 on your verdict form when you go back and deliberate. And this one says a [person] who knowingly or willfully has in his possession any film, photograph or other visual presentation depicting a person under the age of 16 as the subject of a sexual portrayal or engaging in sexual conduct is guilty of the crime of possession of visual presentation depicting sexual conduct of a child. A couple key elements again we're going to break it down to[o]. You need possession, there has to be film or visual presentation and it has to be of a child under the age of 16 and they have to be engaging in sexual conduct.

This is one of the instructions you read—I'm sorry—the Judge read and you'll have it when you go back and deliberate and it says if the parties stipulate to the existence of a fact, you must accept the stipulation of evidence and regard that fact as proved. The parties have stipulated that State's Exhibit 1 through 4 are films or other visual presentations depicting a child or depicting a person under the age of 16 as the subject of a sexual portrayal or engaging or stimulating [sic] or assisting others in engaging in or stimulating [sic] sexual conduct. That's already proven. I'm not even going to talk about that. It's stipulated to; it's proven. Those videos are child pornography.

So, the only thing we need to talk about is possession. How do we know that the Defendant was in possession of those videos? Well once the video is recorded, they were on it, they were in his possession. He recorded them and then he kept them in his possession. And we know he had it in possession all the way

going into March because the police found them on his phone on March 27th 2014. He could have deleted them. If he would have deleted them he would have no longer been in possession of them, but he didn't. Again, they're located on his phone. And this [is] important too because he's had possession in both Las Vegas and Victorville. In Victorville, obviously, when he was arrested with the phone for these charges, he had it in his hand. I'm sorry. He had it in his car. And in Las Vegas, as we said, you're obviously in possession of something if you take a photograph or you take a picture or you take a video of something you're in possession of it after you have it. It's simple, it's clear.

We also know based on Detective Helmick's interview—based on Detective's [sic] Helmick's examination of the phone that those photographs was [sic] actually reorganized on February 14th 2014. You heard from him and he talked about what that modified [indiscernible] meant, that they would have been switched from folder to folder or switched to different devices. So, on Valentine's Day the Defendant didn't [sic] them. I guess he was giving himself a Valentine's Day present to reorganize his photo gallery with child porn in it. I submit to you the only reasonable verdicts is a verdict of guilty one count 13, 14, 15 and 16.

(ECF No. 29-15 at 14–16.)

Hudspath fails to establish a substantial IAC claim within the meaning of *Martinez*. 566 U.S. at 14. There is ambiguity in the last sentence of Instruction 26: "The parties further stipulate to the file names associated with these films and the described conduct as set forth in counts 13 through 16 of the Information." It could, without clarification, suggest Hudspath stipulated that he possessed the films as alleged in counts 13 through 16, suggest the parties stipulated the sexual conduct in the videos met the statutory definition for conviction, or suggest Hudspath agreed that he was guilty of committing the sexual conduct in the videos. The State's closing argument, however, extinguished such ambiguity by confirming the parties had stipulated the video was child pornography and "the only thing we need to talk about is possession." Moreover, defense counsel disputed in closing remarks that the State proved that Hudspath was the individual depicted in the video by arguing the State did not investigate any other male suspects.

Assuming arguendo that trial counsel's performance fell below an objective standard of reasonableness by failing to ensure the instruction was drafted without the ambiguity, there is no reasonable probability the result of the proceeding would have been different without the stipulation that the videos in State's Exhibits 1–4 are child pornography. The State presented overwhelming evidence the videos constituted child pornography. James and Detective Stafford testified about the images portrayed in the videos and the jury saw the videos firsthand. There was also overwhelming evidence Hudspath possessed the child pornography on his cellphone. Belton

42

and James testified they saw the child pornography of Hudspath's cellphone. This was corroborated by the testimony of Deputy Juarez who testified Hudspath admitted the phone belonged to him and the testimony of Juarez and Detective Stafford who each said they saw the child pornography on Hudspath's cellphone. Finally, Detective Helmick testified he extracted the child pornography from Hudspath's cellphone. To the extent that Hudspath contends the instruction suggested he stipulated to his guilt for engaging in the conduct portrayed in the video as alleged in other counts, the evidence identifying him as the adult male in the video was overwhelming. *See supra*, at pp. 26, 29. Hudspath thus fails to establish a substantial IAC claim for trial counsel's agreement to the language set forth in the last sentence of Jury Instruction No. 26. Hudspath fails to overcome the procedural default of this claim and Ground 8 will be dismissed with prejudice.

### I.    Ground 9—Failure to Present any Mitigation Evidence at Sentencing

Hudspath alleges he was deprived effective assistance of counsel under the Fifth, Sixth, and Fourteenth Amendments, because counsel failed to present any mitigation evidence at all at sentencing. He claims counsel failed to (1) argue Hudspath had no criminal history suggesting a propensity to commit sex crimes; (2) investigate Hudspath's psychiatric conditions, including bipolar disorder and nervous condition and how they affected his conduct; and (3) contact and call witnesses to attest to Hudspath's character. Respondents contend Hudspath's claims are conclusory. They claim he fails to show every reasonable attorney would have argued that Hudspath's criminal history failed to show a propensity to commit sex crimes or counsel's failure to do so prejudiced him. They contend he fails to show trial counsel did not investigate Hudspath's mental health history or evidence of a psychiatric condition would have persuaded the court to render a lesser sentence. They contend he fails to establish trial counsel failed to contact character witnesses for sentencing or demonstrate witnesses' testimony would have persuaded the court to render a lesser sentence. (ECF Nos. 23 at 21–22; 56 at 25–26; 59 at 21–22.) The Court finds the state supreme court's determinations in rejecting this claim are objectively reasonable.

Before sentencing, Hudspath filed a motion to dismiss trial counsel because, *inter alia*, counsel "failed to communicate and/or visit" him and failed to "investigate, as to client's

oral/written requests any defense that may help to mitigate or reduce his sentence." (ECF No. 29-18 at 3.) At a hearing initially scheduled for sentencing, defense counsel informed the court he attempted to speak with Hudspath to prepare for sentencing three weeks prior, but Hudspath refused to speak with him, except to advise counsel of his forthcoming motion to dismiss counsel. He claimed the reason why he was housed nearby was so he and trial counsel could go through trial strategy, but counsel never went to see him "not once." Hudspath felt there was a conflict. He was uncomfortable with trial counsel representing him at sentencing and on appeal because counsel refused to do a lot of things Hudspath requested of him. Hudspath said he "one time" did not speak with counsel because counsel told him he could not have transcripts until after sentencing. (ECF No. 65-1 at 3–6.) Trial counsel stated he visited Hudspath 10 or 12 times and went to see Hudspath three weeks before the initial sentencing hearing date but was told Hudspath doesn't want to talk about anything and there would be a motion. (*Id.* at 7–9.) The trial court told Hudspath it was to his benefit to meet with trial counsel to discuss what will happen at sentencing and continued the sentencing hearing for three weeks. (*Id.* at 11–12.)

The Nevada Department of Public Safety, Division of Parole and Probation, prepared a PSI to assist the court in sentencing Hudspath. The report noted Hudspath was "arrested, detained, or cited in California for . . . offenses for which no disposition is noted [in his SCOPE, NCIS, and NCIC records], prosecution was not pursued, or charges were not pursued." One of the offenses listed was "Possession/ETC Obscene Matter: Minor: Sex (2)." The report additionally noted Hudspath reported a diagnosis for bipolar disorder and a nervous condition in 2013 in California. (ECF No. 52-1 at 3–5.)

Defense counsel appeared for Hudspath at sentencing and noted corrections required to the PSI. The State requested consecutive sentences for an aggregate of 300 years to life. Defense counsel argued for an aggregate sentence of 35 years to life to give Hudspath an opportunity at rehabilitation. The trial court sentenced him to 70 years to life, stating:

> Okay, I will say frankly that this case is one of the most disturbing I've ever seen, ever. Having said that, Mr. Hudspath is 40 years old so I think probably 70 years on the bottom is enough to insure that we don't have this kind of victimization again. Forcing a young girl to perform oral sex and filming it repeatedly is offensive.

. . . .

(ECF No. 50-11 at 3–9.)

In postconviction review proceedings, Hudspath's supplemental petition alleged trial counsel was ineffective in failing to communicate with Hudspath regarding his sentencing proceeding and failed to provide background about Hudspath, including positive aspects of his life. Hudspath claimed he had a "witness that could have provided information on his behalf to the Court that would justify the Court potentially giving him a reduced sentence," however, trial counsel never contacted the witnesses regarding, what, if any, information they would have in support of Hudspath. (ECF No. 17-8 at 12–13.)

The Supreme Court of Nevada rejected the claim that trial counsel was ineffective:

> Hudspath next argues that counsel should have communicated with him about the sentencing proceedings and should have introduced mitigating evidence. Hudspath, however, only states that he would have informed counsel about unspecified witnesses who "could" provide information "potentially" justifying a less severe sentence. Thus, Hudspath has not stated specific factual allegations that would entitle him to relief if true. The district court therefore did not err in denying this claim without an evidentiary hearing.
>
> . . . .
>
> Hudspath next argues that counsel should have investigated his bipolar disorder to present its effects at sentencing. Hudspath's mental health diagnosis was set forth in the presentence investigation report, and Hudspath has not alleged what further investigation would have uncovered. Hudspath has not shown deficient performance or prejudice in this regard. The district court therefore did not err in denying this claim without an evidentiary hearing.

(ECF No. 17-12 at 4–5.)

It was objectively reasonable for the state supreme court to determine trial counsel did not perform deficiently by failing to argue Hudspath's criminal history supports no propensity to commit sex crimes. The PSI noted an arrest for possession of sexually explicit materials involving a minor. An objectively reasonable trial attorney would have avoided arguing that Hudspath had no criminal history for sex crimes out of concern that doing so would have drawn attention to that arrest. Second, it was reasonable for the state supreme court to conclude Hudspath failed to demonstrate trial counsel's performance was deficient or prejudicial insofar as counsel did not obtain and present a psychiatric evaluation. The diagnoses for bipolar disorder and a nervous condition were disclosed in the PSI. Hudspath did not demonstrate that, but for counsel's failure

to investigate and obtain a psychiatric evaluation, the result of the sentencing proceeding would have been different. The "[t]he likelihood of a different result must be substantial, not just conceivable." *Richter*, 562 U.S. at 112; *Pinholster*, 563 U.S. at 189. Finally, it was reasonable for the state supreme court to determine that Hudspath did not establish trial counsel failure to call mitigation witnesses was deficient and prejudicial. The trial court remarked the sentence was based on the severity of the crimes and deterrence of future crimes. Hudspath failed to allege with specificity any mitigation witness, testimony, or evidence that trial counsel failed to investigate and present. He also failed to establish there is a reasonable probability such evidence would have addressed the trial court's concerns and resulted in a lesser sentence.

The state supreme court determinations are neither contrary to nor constitute an unreasonable application of clearly established federal law as determined by the Supreme Court and are not based on unreasonable determinations of fact in light of the evidence presented in the state court proceeding. Hudspath is not entitled to federal habeas corpus relief for Ground 9.

**J.      Ground 10—Jury Instruction No. 19**

Hudspath alleges he was deprived his Fifth Amendment right to due process because Jury Instruction No. 19, allowed jurors to find that two videos of allegedly one event constituted separate criminal incidents. Respondents contend the instruction did not violate due process because it was supported by Dicaro's testimony, and the videos depicted events filmed 11 minutes apart. (ECF Nos. 23 at 22–24; 56 at 28–30; 59 at 67.)

Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *See Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("Outside the capital context, we have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error. To the contrary, we have held that instructions that contain errors of state law may not form the basis for federal habeas relief."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)); *see also DeChristoforo*, 416 U.S. at 643. If a petitioner alleges an instruction

is ambiguous, a court considers "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Id.* (quoting *Boyde,* 494 U.S. at 380). Individual instructions are viewed "in the context of the entire trial and the jury instructions taken as a whole." *Id.* (quoting *Naughten*, 414 U.S. at 147).

In Hudspath's case, the trial court noted State's Exhibit 2 commenced at 3:32 a.m., State's Exhibit 3 at 3:43 a.m., and State's Exhibit 4 at 5:27 a.m., and inquired about Jury Instruction No. 19 and whether the alleged encounters could be a basis for more than one charge. The defense objected to the instruction arguing exhibits 2 and 3 were one act and nothing broke up the acts. The court overruled the objection. (ECF Nos. 50-9 at 183–84; 50-10 at 3–5.) The trial court gave Jury Instruction No. 19, which explained to the jury its consideration whether a sexual assault constitutes a single act or may be considered multiple acts. *See supra*, at pp. 37–38.

In closing remarks, the State argued, when multiple sexual acts occur as part of a singular criminal encounter, a defendant may be found guilty for each separate or different act of sexual assault or lewdness. The State argued the three videos of the incident on January 19th depict separate and distinct acts. The State argued that if something interrupted Hudspath, "like R.H. said, her brothers were coming in and out so he was being interrupted," and "he turns around and does the same act, that's a separate and distinct charge." But the State argued this was not one continuous act. Defense counsel responded in closing argument for Counts 2 and 3, "the State has not shown other than a stoppage of the recording that there were two separate acts. The time stamps—and I don't have the seconds—are 3:32 a.m. for count two, 3:43 a.m. for count 3. The State has not shown beyond a reasonable doubt that those are separate and distinct acts. So, at the very least there should not be a count 3." (ECF No. 50-10 at 10–11, 23.)

On direct appeal, the Supreme Court of Nevada determined the trial court did not abuse its discretion when it gave Instruction 19 because the question whether the videos constituted a single or separate acts was a question for the jury. *See supra*, at p. 39.

As stated in Ground 7, the evidence presented conflicting inferences whether the videos taken on the same day at 3:32 and 3:43 a.m., depicted one continuous act or multiple acts. Thus, the ultimate determination was a decision for the jury, and it is presumed the conflicting inferences

were resolved by the jury in rendering its verdict. *See* supra, at pp. Under the circumstances, it is objectively reasonable to conclude the instruction was neither erroneous nor infected the entire trial with unfairness such that the resulting conviction violates due process. The Supreme Court of Nevada's determination is neither contrary to nor constitutes an unreasonable application of clearly established federal law as determined by the Supreme Court and is not based on unreasonable determinations of fact in light of the evidence presented in the state court proceeding. Hudspath is not entitled to federal habeas relief for Ground 10.

### K.   Cumulative Error

Hudspath made no cumulative error argument in his petition but raises cumulative error in his reply brief. (ECF Nos. 23; 59 at 69–72.) The Court declines to consider new claims of error raised for the first time in a counseled reply brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007); *Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994).

### IV.   Motion to Strike Exhibits

Respondents moved to strike the documents filed as ECF Nos. 29-2, 29-4, 29-5, 29-7, 29-9, 29-12, 29-13, 29-14, 29-15, 29-21, 29-30, 30-2, 30-3, 30-7, 30-16, 30-20, 30-23, 30-24, 30-26, 30-27, 30-33, and 30-34, on the grounds they were filed without redaction required by LR IC 6-1. Compelling reasons exist to seal the documents as they contain personal-data identifiers. The Court will direct the Clerk of the Court to seal those documents.

### V.   Certificate of Appealability

This is a final order adverse to Hudspath. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a COA. This Court therefore has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack*, 529 U.S. at 484 (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). When a habeas petition is denied on procedural grounds without reaching the merits of the underlying constitutional claim, "[a] COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether

the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the Court is correct in its procedural ruling." *Id.* Applying this standard, as discussed, a certificate of appealability is warranted for Ground 1. A certificate of appealability is not warranted for Grounds 5, 9 and 10, as reasonable jurists would not find the Court's assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. at 484. A COA is furthermore denied as reasonable jurists would not find it debatable or wrong whether the Court is correct in its procedural rulings dismissing Grounds 2, 3, 4, 6, 7, and 8 and dismissing Hudspath's claims that the standard of review in 28 U.S.C. § 2254(d) is unconstitutional. *Id.*

## VI.   Conclusion

**IT IS THEREFORE ORDERED:**

1. Grounds 1, 5, 9, and 10 are DENIED on the merits. Grounds 2, 3, 4, 6, 7, and 8 are DISMISSED with prejudice as procedurally defaulted. Hudspath's claims that the standard of review in 28 U.S.C. § 2254(d) is unconstitutional (ECF No. 23 at 10) are dismissed with prejudice. The Petition (ECF No. 23) is DENIED with prejudice.

2. A certificate of appealability is GRANTED for Ground 1 and DENIED for all other grounds, claims, and allegations in the petition.

3. The motion for an evidentiary hearing (ECF No. 60) is DENIED.

4. Respondent's motion to seal (ECF No. 50) the documents filed as ECF Nos. 29-2, 29-4, 29-5, 29-7, 29-9, 29-12, 29-13, 29-14, 29-15, 29-21, 29-30, 30-2, 30-3, 30-7, 30-16, 30-20, 30-23, 30-24, 30-26, 30-27, 30-33, and 30-34, is GRANTED.

5. The Clerk of Court is directed to seal the documents identified in paragraph 4.

6. The Clerk of Court is directed to substitute Tim Garrett for Respondent Kyle Olson.

7. The Clerk of the Court is directed to enter judgment accordingly and close this case.

DATED this 20th day of November, 2023.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE